**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Janice Kearney<br>Samantha Rodriguez<br>Gwendolyn Bird<br>Laurie Goldstein and<br>On behalf of themselves and all others<br>similarly situated<br>      Plaintiffs<br>v.<br>Cavalry Portfolio Services LLC<br>Cavalry SPV I LLC<br>Choi Law Office PLLC<br>Danielle C. Choi<br>Schachter Portnoy, LLC<br>Craig Faye and<br>John Does # 1 - 10<br>      Defendants | Case No.:  <u>1:12-cv-00860 (DLI) (RML)</u> |

**PLAINTIFFS' FIRST-AMENDED COMPLAINT AND JURY DEMAND**

Plaintiffs Janice Kearney, Gwendolyn Bird, Samantha Rodriguez, and Laurie Goldstein, on behalf of themselves and all others similarly situated, bring suit against Defendants for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. 1692, *et seq.*, New York General Business Law (GBL) § 349 *et seq.*, New York Judiciary Law § 487, for systematically filing and prosecuting thousands of collection lawsuits without having standing to do so, and for other acts.

### A.   JURISDICTION AND VENUE

1.     The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. 1692, *et seq.* Jurisdiction of the Court arises under 28 U.S.C. 1331 in that this dispute involves predominant issues of federal law, the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. 2201 and 2202.    The court has supplemental jurisdiction under 28 U.S.C. §1367 over plaintiff's state law claims because said

1

claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Kings County, New York for Plaintiff Janice Kearney; and Richmond County New York for Plaintiff Gwendolyn Bird.

3.      Plaintiff Janice Kearney is an individual who resides in Kings County, New York. Plaintiff Gwendolyn Bird is an individual who resides in Richmond County, New York. Plaintiff Samantha Rodriguez is an individual who resides in Bronx County, New York.  Plaintiff Laurie Goldstein is an individual who resides in Westchester County, New York.

4.      Defendant CAVALRY PORTFOLIO SERVICES LLC is a corporation organized under the laws of the State of Delaware, with its principle place of business at 500 Summit Lake Drive, Suite 400, Valhalla, NY 10595. It may be served by and through the New York Secretary of State, One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231.

5.      Defendant CAVALRY SPV I LLC is a corporation organized under the laws of the State of Delaware, with its principle place of business at 500 Summit Lake Drive, Valhalla, NY 10595. It may be served by and through the New York Secretary of State, One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231.

6.      Defendant CHOI LAW OFFICE PLLC is a corporation organized under the laws of the State of Delaware, with its principle place of business at 500 Summit Lake Drive, Suite 4A, Valhalla, NY 10595. It may be served by and through the New York Secretary of State, One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231.

7.      Defendant DANIELLE C. CHOI is an individual who, on information and belief, is a resident of the State of New York. Her principal place of business is located at 500 Summit Lake Drive, Suite 4A, Valhalla, NY 10595. She may be served at his place of employment, or wherever she may be found.

8.      Defendant SCHACHTER PORTNOY, LLC is a corporation organized under the laws of the State of New Jersey, with its principle place of business at 3490 U.S. Route 1, Princeton, NJ 08540. It may be served by and through the New York Secretary of State, One Commerce Plaza, 99 Washington Avenue, Albany, NY 12231.

9.      Defendant CRAIG FAYE is an individual who, on information and belief, is a resident of the State of New York. His principal place of business is Schachter Portnoy, LLC located at 500 Summit Lake Drive, Suite 4A, Valhalla, NY 10595. He may be served at his place of employment, or wherever she may be found.

## B.      NATURE OF THE CLAIMS

10.    This lawsuit involves the filing and litigating of thousands of illegal collection lawsuits by all Defendants in the name of Cavalry Portfolio Services. Through the coercion of illegal debt collection litigation under the name of Cavalry Portfolio Services, all Defendants inflicted damage on thousands of unsuspecting consumers in New York State. This damage to the class includes taking money from consumers under threat of litigation and threat of judgment and court costs when Defendants had no right to bring or prosecute these suits; and in engaging in post-judgment collection activities. The damage also includes the time spent and costs incurred by consumers to defend against meritless collection lawsuits that should never have been filed

3

and should never have been prosecuted.

## C.   RELATIONSHIP OF DEFENDANTS

11.   Cavalry SPV I, LLC (SPV I) purchases hundreds of thousands of charged of consumer accounts for pennies on the dollar. SPV I owns title to the debts.

12.   Cavalry Portfolio Services ("CPS") is the servicer for SPV I. CPS is assigned rights to seek to collect the debt, but is not assigned title or ownership to the debt, which remains with SPV I. CPS is the sole servicer of SPV I ("SPV"). [1]

13.   SPV I collects debts directly or indirectly through CPS, its sole servicer. SPV has CPS file collection suits on its behalf SPV but in the name CPS. Therefore, SPV is jointly and severally liable for the debt collection violations of CPS committed in filing suit in its own name when seeking to collect a debt for SPV. As such, the term Cavalry Defendants means CPS and SPV, jointly and severally.

14.   The Cavalry Defendants retained law firms to file collection lawsuits in the name of CPS. On information and belief, until October, 2010 the Cavalry Defendants retained the Thomas Law Offices PLLC and its attorney Anne Thomas (collectively "Thomas") to file and prosecute collection lawsuits in the name of CPS. This action is not brought against Thomas given the time period since Thomas was attorney of record for CPS. Subsequent to Thomas, the Cavalry Defendants retained the Choi Law Office PLLC its attorney Danielle C. Choi (collectively "Choi") and, most recently, retained Schachter Portnoy, LLC and its associate Craig Faye, Esq.

---

1  There is a related entity named SPV II that serves the same function as SPV II (it owns title to debt serviced exclusively by CPS). As SPV II is not a party to this suit, when this complaint refers to SPV, it is intended to apply solely to SPV I, unless otherwise indicated.

4

(collectively "Schachter" or "SP") to collect debts through litigation in the name of CPS. Defendants Choi and Schachter (collectively the "Law Firms") are each "debt collectors" under the FDCPA, as are the Cavalry Defendants.[2]

15.     The illegality of the collective debt collection activities of all Defendants in this action are demonstrated by the four corners of the pleadings they file in the collections lawsuit they bring in the name of CPS, and the documents they reference in the collections lawsuits.

16.     Cavalry is directly liable for its *own* FDCPA violations. This liability is in addition to any vicarious liability for the acts of its actual and apparent agents, the Law Firms, operating within the course and scope of their agency, and receives specific direction from Cavalry.

17.     CPS is directly liable for its own actions as it is integrally involved in the debt collection litigation process. CPS' complaints against Named Plaintiffs are verified by a "Legal Administrator" of CPS or an "Assistant Vice President" of CPS.

18.      CPS directly verifies that the facts in the complaint are true, and it is CPS' policy, pattern, and practice to do so. One of the facts alleged in the verified complaints is that CPS is the "lawful owner" of the putative account, a statement which is false. The verification assert that the facts alleged in the complaint (other than those explicitly stated as based upon information and belief) are within the personal knowledge of the affiant. The verified complaints in the collection lawsuits themselves state that CPS "by and through its attorney…. complaining of the [consumer] alleges….

---

2 Incidentally, the addresses the Law Firms (and Thomas) operate out of the same building as the Cavalry Defendants, bespeaking the point the Law Firms are just an extension the debt collection operation of the Cavalry Defendants.

[CPS], through assignment, is the lawful owner of a consumer credit contract executed by the [consumer]."

19.     When CPS makes an application for a default judgment, it is CPS' policy, pattern, and practice to filed an "Affidavit of Facts Constituting the Claim the Default, and the Amount Due" signed by a "Legal Administrator" of CPS. In the affidavit the Legal Administrator "being duly sworn, deposes and says…. that the deponent has personal knowledge of the facts constituting the claim, the default, and the amount due, said personal knowledge is based upon the file maintained by the deponent and documents contained therein… [that] there was due and owing the Plaintiff, Cavalry Portfolio Services, LLC the amount of [the amount claimed] with interest from [a date certain], together with costs and disbursements of this action, amount in all to the sum of [a number certain.]"

20.     When CPS makes an application for a default judgment, it is also CPS' policy, pattern, and practice to filed to file "Affidavit of Witness of Plaintiff (Debt Buyer)," again signed by a "Legal Administrator" of CPS.

21.     CPS has filed more than 8,000 lawsuits from 2008 – 2011through Thomas, who was then substituted out with Choi, who was then substituted out with Faye.[3]   Thomas was a solo practitioner who was not even licensed to practice law in NY until 2005. Choi was a solo practitioner who was not licensed until 2008.  Faye was not licensed until 2009. All of the pleadings, discovery, and collection letters for the lawsuits they filed and prosecuted went out

---

3 This does not include filings in Supreme Court or in Civil or City Courts that do not participate in the E-courts system, www. http://iapps.courts.state.ny.us.com.

under the individual signatures of Thomas, Choi, or Faye. Thomas, Choi, and Faye all operated out of the same building as CPS. CPS has hundreds of employees. All of the lawsuits filed in the name of CPS New York from 2008 to present have been filed through Thomas, Choi, or Faye.[4]

22.    CPS litigates nationwide through its own *internal* network of 55 law firms. CPS negotiates the contingent fee terms with the 55 law firms.

23.    Given the above facts, CPS gives specific direction to the Law Firms, and exercises control and has a right of control of the Law Firms specific manner, method, and form of debt collection litigation.

## D.    THE NAMED PLAINTIFFS

24.    In describing the debt collection litigation brought against the named plaintiffs, it is assumed, arguendo, that the sales and assignment documents are accurate. This is not to suggest that there are not defects in evidence in these collection lawsuits, such as incomplete assignments, or failure to tie a general assignment to a specific consumer, or to provide evidence of the putative credit agreement.

25.    Attached to the complaint and incorporated by reference are the pleadings, discovery and collections letters for each of the named plaintiffs that are pertinent to this class action.[5]

   **a.  *Samantha Rodriguez.***

---

4 The use of the name Faye in this paragraph means litigation by SP, which Faye is the attorney of record. Faye purports to sign all of the pleadings, discovery, and letters on behalf of SP its CPS cases.

5  It should be pointed out that some of the pleadings in the collections lawsuits are signed on one date, but the court stamp on the document or the court's electronic records demonstrate it was in fact filed at a later date. This is especially true of complaints. Where there is a discrepancy this complaint will generally use the date where the court records actually indicate a pleading was filed.

26.     On January 30, 2004, a default judgment was entered in Orange County Court of Florida in favor of DaimlerChrysler and against Samantha Rodriguez for $9,519.18, with post-judgment interest to accrue at 7%.

27.     On August 28, 2010, CPS, through Thomas, filed a verified complaint in Bronx Civil Court seeking to enforce the Florida judgment. By way of its lawsuit, CPS sought 9% interest on the Florida judgment even though the very judgment CPS attaches to its complaint stated that post-judgment interest was to accrue at just 7% interest.

28.     As with all complaints filed by CPS, this complaint contained a verification signed by a Cavalry employee or corporate officer, in this case a putative Assistant Vice President of CPS. The verification states that the Assistant Vice President "being duly sworn, deposes, and says… I have read the foregoing Complaint, and know the contents thereof; that the contents of the foregoing Complaint are true of my knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true."

29.     The complaint which the CPS Assistant Vice President verified stated "Plaintiff [CPS], through assignment, is the lawful *owner* of a consumer credit contract executed by the Defendant(s)." (emphasis added). It is the policy, pattern and practice of CPS to file complaints verified by an Assistant Vice President, a Legal Administrator, or other person directly from CPS to sign sworn verifications in CPS's complaints that CPS was the "owner" of the putative account.

30.     On October 19, 2010, Choi was substituted for Thomas as counsel for CPS.

31.     CPS never served Ms. Rodriguez with the summons and complaint. Instead, CPS filed a

false affidavit of service with the clerk, and based on that false affidavit was able to obtain a default judgment.

32.     Specifically, on December 6, 2010 the process server, Benjamin Lamb of the process serving company Samserv, Inc., contended he delivered the summons and complaint to an unidentified man at 1749 Grand Concourse, Apt. 8F, Bronx, NY. The process server states that the unnamed man confirmed Ms. Rodriguez lived at that address, and that she was not in the military.

33.     On February 25, 2011 CPS, through Choi, filed a Statement for Judgment, seeking to obtain a default judgment based on the false affidavit of service. In making its application for judgment, CPS attached an Affidavit of Witness of Plaintiff (Debt Buyer)," again signed by a "Legal Administrator" of CPS.[6]  It is the policy, pattern, and practice for CPS to use an Affidavit of Witness in seeking entry of default, and to do so without attaching any of the assignment documents referenced in the affidavit. The Affidavit was designed to deceive the court to believe

---

6  While the Affidavit represents documents are attached, this is in fact not true. The affidavit states:

[Affiant] being duly sworn, deposes, and says: the deponent is the Legal Administrator of the Plaintiff, CAVALRY PORTFOLIO SERVICES, LLC AS ASSIGNEE OF CAVALRY SPV I, LLC, AS ASSIGNEE OF CHRYSLER FINANCIAL SERVICES, LLC.

**Chain of Title:**

Based upon the attached affidavit(s) of sale on 12/21/2007, Chrysler Financial Services, LLC sold a pool of charged-off accounts by a Purchase Agreement and a Bill of Sale to Cavalry SPV I, LLC. As part of that sale, electronic records of individual accounts kept in the ordinary course of business of Chrysler Financial Services, LLC were transferred to Cavalry SPV I, LLC. The defendant's account subject of this lawsuit was included in the purchase, and Cavalry SPV I, LLC received account records of the defendant. The account was then transferred to Cavalry Portfolio Services, LLC for servicing. These records were incorporated into the debt buyer's records and kept in the regular course of business.

The defendant's account subject of this lawsuit was included in the purchase, and each debt buyer received account records of the defendant. These records were incorporated into the debt buyer's records and kept in the regular course of business.

I believe that there are no errors in these accounts. The above statements are true to the best of my knowledge.

that the purported "assignments" transferred to CPS a right to enter judgment in its own name which, as explained be, it did not.

34.     When CPS makes and application for a default judgment, it is its policy, pattern, and practice to also file "Affidavit of Witness of Plaintiff (Debt Buyer)," again signed by a "Legal Administrator" of CPS.[7]

35.     The Statement for Judgment and attached Affidavit of Facts sought to obtain judgment in the name of CPS for the amount of the debt, plus costs and disbursements.[8]

36.     Based on the false affidavit of service and the representation of CPS in its application for judgment, the clerk entered default judgment against Ms. Rodriguez on March 4, 2011 for $14,528.28.

---

[7] For example, the Affidavit of Witness used to obtain a default judgment against Named Plaintiff Rodriguez states as follows. While the Affidavit represents documents are attached, this is in fact not true:

[Affiant] being duly sworn, deposes, and says: the deponent is the Legal Administrator of the Plaintiff, CAVALRY PORTFOLIO SERVICES, LLC AS ASSIGNEE OF CAVALRY SPV I, LLC, AS ASSIGNEE OF CHRYSLER FINANCIAL SERVICES, LLC.

**Chain of Title:**

Based upon the attached affidavit(s) of sale on 12/21/2007, Chrysler Financial Services, LLC sold a pool of charged-off accounts by a Purchase Agreement and a Bill of Sale to Cavalry SPV I, LLC. As part of that sale, electronic records of individual accounts kept in the ordinary course of business of Chrysler Financial Services, LLC were transferred to Cavalry SPV I, LLC. The defendant's account subject of this lawsuit was included in the purchase, and Cavalry SPV I, LLC received account records of the defendant. The account was then transferred to Cavalry Portfolio Services, LLC for servicing. These records were incorporated into the debt buyer's records and kept in the regular course of business.

The defendant's account subject of this lawsuit was included in the purchase, and each debt buyer received account records of the defendant. These records were incorporated into the debt buyer's records and kept in the regular course of business.

I believe that there are no errors in these accounts. The above statements are true to the best of my knowledge.

[8]   The amount of the judgment CPS sought to obtain was also inflated based on its own numbers. The Affidavit of Facts stated, "As of February 2, 2011, there was due and owing the Plaintiff, Cavalry Portfolio Services, the amount of $14,323.28." As a simple matter of math, CPS was inflating the amount due by $576.23 for judgment of $9,519.18 accruing post-judgment interest at 7% since January 30, 2004. CPS demanded judgment in its own name for $14,525.28, which included "costs and disbursements in this action" of $202.00.

37.     In Friday, July 15, 2011, Ms. Rodriguez was applying for housing. During the course of the application, Ms. Rodriguez was informed that she could no be approved for housing because of a judgment listed on her credit report by CPS. This was the first time Ms. Rodriguez knew anything of the collections lawsuit against her by CPS.

38.     First thing on Monday, July 18, 2011, Ms. Rodriguez went straight to the Bronx Civil Courthouse to find out what was going on. In her *pro se* Affidavit in Support of an Order to Show Cause to Vacate a Judgment for Failure to Answer filed on July 18, 2011, Ms. Rodriguez stated why she desperately needed to vacate the default judgment. (The grammatical errors are in the original).

> i didnt receive paper work i do not reside at 1749 grandcourse since june,2010
> unfortunatly been residing in a shelter due to an domestic violence issue .on Friday
> 7/15 i went for an interview for an apartment which brought me upto date
> Knowledge of this case on my credit report when searching my credit by the
> Apartment interviewer and now i have been denied apt because of this on my
> credit. im trying to get my life back together and out of the shelter.

39.     The default judgment by CPS was preventing Ms. Rodriguez from being able to get herself and her 14 year old daughter out of the shelter that they had been living since Ms. Rodriguez fled from a domestic violence situation, and into a more permanent housing.

40.     On July 28, 2011 CPS, through Choi, filed an Affirmation in Opposition to the pro se order to show cause, and attached the Samserve, Inc. affidavit of service. It is incredible that CPS would rely on the affidavit of Samserv.  Ms. Rodriguez stated under oath she did not reside at the address where Samserv claimed she was residing. Therefore, there could not have been an individual named "John" to confirm her living at an address which she was not living at. Moreover, Samserv has been sued in a class action lawsuit for systematically filing false

affidavits of service. That suit has survived a motion to dismiss. Sykes v. Mel Harris & Assocs., LLC, 757 F. Supp. 2d 413 (S.D. N.Y. 2010). The complaint in Sykes documented widespread fraud in the affidavits of service executed by Samserv. On information and belief all Defendants were aware of the sewer service claims documented by the Sykes complaint against Samserv. It was unreasonable for CPS to attempt to rely on the affidavit of a Samserv process server when faced with a sworn statement of contravention. In any case, the opposition to the motion to vacate judgment is an attempt to retain a judgment in the name of CPS, who never had standing to file suit at the outset.

41.     On August 3, 2011 Bronx Civil Judge Lizabeth Gonzalez vacated the default judgment and directed Ms. Rodriguez to file an answer, which she did later the same day.

42.     On August 31, 2011, the Bronx Civil Court Judge ordered CPS to answer discovery requests, and specifically ordered CPS to provide a complete chain of assignment. The case was adjourned to November 23, 2011.

43.     On September 2, 2011 CPS, through Choi, filed with the Court the documents it was ordered to serve on Ms. Rodriguez. CPS enclosed the following documents, which, themselves, demonstrate that CPS never had standing to file suit in the first place.

44.     Given the affirmative representation in the complaint that CPS was the owner and the deceptive language used in the affidavits filed in conjunction with an application, it is not known or knowable to a consumer or to the court that in fact CPS did not own title to the putative debt.

45.     One of the documents produced was an "Affidavit of Claim" drafted and executed by CPS. The Affidavit of Claim ¶ 5 stated "the Account was purchased by Cavalry SPV I, LLC on

12/21/2007 and **the servicing and collection rights** for the account **were assigned** by Cavalry SPV I, LLC to Cavalry Portfolio Services, LLC." (emphasis added)

46.     A document entitled Assignment, "effective as of December 28, 2007," stated SPV I assigns to CPS "all of Assignor's [SPV I's] rights to pursue collection or judicial enforcement of obligations under each of the Assignor's accounts…, including engagement of attorneys and commencement of legal actions reasonably required to enforce said legal actions…"

47.     In contrast, the Bill of Sale and Assignment of Accounts says that the underlying creditor, DaimlerChrysler, "hereby absolutely sells, transfers, assigns, sets-over and conveys to Cavalry SPV I, LLC… (a) **all of Seller's** [DaimlerChrysler] **right, title and interest** in and to each of the Accounts."

48.     Under New York law, for an assignee to have standing and capacity to sue, the assignee must be the "real party in interest,"[9] which means that the assignee "must have some title, legal or equitable, to the thing assigned."[10]  Merely granting the power to sue on or enforce a claim or set of claims is not enough for a valid assignment.[11]  Essential to an assignment is that the assignor is *entirely* divested of all control over the thing assigned.[12]

49.     In *Spencer v. Standard Metals & Chemicals Corporation*, the seminal case on what

9 *See Carvel Farms Corp. v. Bartomeo*, 272 N.Y.S.2d 507, 510 (Sup. Ct. 1965) (despite CPLR § 1004 supplanting the explicit use of "real party in interest" in § 210 of the old Civil Practice Act, the real party in interest requirement was not "stricken from the law" and it has since become a requirement of substantive law).
10 *Spencer v. Standard Metals & Chemicals Corporation*, 237 N.Y. 479, 480-81 (1924). *Spencer* interpreted the phrase "real party in  interest" under § 210 of the old Civil Practice Act.  § 210's successor provision, CPLR § 1004, provides an enumerated list of representatives who may bring suit by or against a party.
11 *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17-18 (1997) ("The grant of a power of attorney,  however, is not the equivalent of an assignment of ownership; and, standing alone, a power of attorney does not enable the grantee to bring suit in his own name") (citing *Titus v. Wallick*, 306 U.S. 282, 289 (1939)).
12 *Richstone v. Chubb Colonial Life Insurance*, 1999 WL 287332 *6 (May 7, 1999, S.D.N.Y.).

constitutes a valid assignment, the New York Court of Appeals held that an instrument giving an attorney the "power to commence or prosecute any suit or action or other legal proceedings for the recovery of damages, debts, demands, choses in action, causes or things whatsoever," did not suffice to show that legal title to the claim had actually been assigned.[13]

50.      Here, there is even less support for the conclusion that legal title to Defendant's account had been assigned to Plaintiff.  First, the Affidavit of Claim states merely that "the servicing and collection rights for [Defendant's] account were assigned by Cavalry SPV I, LLC to Cavalry Portfolio Services, LLC."  If an instrument granting an attorney the power to commence or prosecute any suit or action for the recovery of debts is held to be an incomplete assignment, then granting servicing and collection rights are also a grant of something less than full assignment.[14]

51.      The purported Assignment document merely assigns "Assignor's rights to pursue collection and judicial enforcement of obligations under each of Assignor's accounts."  This does not suffice to show anything more than a similar assignment to that given in *Spencer*, which was held to be an incomplete assignment.

52.      The Affidavit of Claim ¶ 4 continued to obtain accruing interest "at a rate of 9%" when the Florida judgment limited interest to 7%.

53.      On November 23, 2011, CPS's collection lawsuit was dismissed with prejudice as CPS was not ready for trial.

---

13 *Spencer*, at 481-82.
14 *See Spencer*, at 481-82; *Advanced Magnetics*, at 17-18 (instrument granting assignee power to commence actions related to a securities offering is not a valid assignment).

54.     Ms. Rodriguez suffered actual damages as a result of the actions of Defendants. These actual damages include, without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage for the mailing of pleadings and discovery, payment for copies, the payment for transportation to and from the courthouse, the loss of time in having to attend the court hearings. Actual damages include extreme mental and emotional distress, including anger, frustration, anxiety, feelings of powerlessness; a delay in being able to move herself and her young daughter out of the domestic violence shelter and into more permanent housing; and increased family stress with her daughter as a result of having to live in the shelter for a needlessly extended period of time. The judgment CPS obtained was the fruit from the poisonous tree of CPS filing suit in its own name when it had no standing to do so.

### b.  *Janice Kearney*

55.     On or about June 10, 2010, CPS filed suit against Janice Kearney in the Civil Court of the City of New York, Kings County.  As with all the complaint at issue in this class action, CPS threatened "Judgment against Defendant(s) for [a sum certain], with costs and disbursements of this action, and interest therein."

56.     As CPS did not have standing to file suit, the threat to enter judgment was a threat to take an action prohibited by law, and mischaracterized the character and status of the putative debt.

57.     On August 18, 2010, Ms. Kearney answered the complaint.

58.     On or about October 19, 2010, Defendant Choi served Ms. Kearney with an affidavit of debt with a bill of sale regarding the debt allegedly owed by Ms. Kearney.

59.     On October 22, 2010, Choi filed as substitute counsel for Thomas in the instant case.

15

60.     On January 5, 2011, CPS, through Choi, filed a motion for summary judgment.

61.     On February 14, 2011, Kearney filed an affirmation in opposition to CPS's motion for summary judgment, stating that the documents establishing CPS's ownership of the debt were incomplete and inconclusive.

62.     On March 1, 2011, CPS, through its attorney Choi, mailed its Reply to Kearney's Response opposing summary judgment. CPS, through its attorney Choi, incorporated by reference (¶ 5)  the "Affidavit of Claim with Bill of Sale, Assignment, and redacted list of accounts transferred, evidencing the chain of *ownership* of the subject debt concluding with" CPS. (emphasis added).

63.     The assignment documents CPS and Choi reference in their Reply is typical of the type of assignment documents that demonstrate, on their face, that CPS never had standing to file suit.

64.     There is a putative Bill of Assignment of March 20, 2009 from Chase Bank USA, NA ("Seller") to Riverwalk Holdings, Ltd ("Buyer"). The Bill of Assignment states Chase "hereby assigns… *all rights, title and interest* of Seller [Chase] in and those certain receivables, judgments or evidence of debts…" (emphasis added).  Similarly, a separate Bill of Sale from Riverwalk to SPV I dated October 29, 2009, hereby "assigns... *all rights, title and interest* of Seller [Riverwalk] in and those certain receivables, judgments or evidence of debts…"

65.     No problem so far; "all, rights, title and interest" have been assigned from Chase to Riverwalk to SPV I.

66.     However, the "Affidavit of Claim" demonstrates the shortcoming of the assignment from SPV I to CPS.  Item # 5 of the Affidavit states, "the Account *was purchased by Cavalry SPV I, LLC on 10/30/2009* and *the servicing and collection rights for the account were assigned* by

16

Cavalry, SPV I, LLC to Cavalry Portfolio Services, Inc." Therefore, the CPS Affidavit itself does not state that title of the debt was assigned, but only the "servicing and collection rights." Item # 4 of the Affidavit states the principal balance continues to accrue interest at a 24% rate.

67.     On March 16, 2011, plaintiff's motion for summary judgment was denied by Hon. Katherine Levine of the Civil Court of the City of New York, Kings County. Judge Levine ruled CPS failed to prove "the assignment of the debt from the original creditor to" CPS.

68.     On April 14, 2011, plaintiff filed a certificate of readiness for trial which stated that all pleadings had been served and there was no more necessary discovery to be completed.

CPS, through SP, moved to and was able to adjourn the first trial setting in order to continue to drag out the litigation for which it had not right.

69.     Kearney also paid money to CPS, through SP, as a result of their deceptive and abusive threats to enter judgment against her. The stipulation threatened to enter judgment against Kearney in the name of CPS for the full amount sought in the collection lawsuit if Kearney did not pay the money to CPS, through SP. Kearney paid the money. The settlement released no claims Kearney had against CPS or SP.

70.     The pertinent pleadings and discovery responses in the Kearney collection lawsuit are attached and incorporated by reference.

71.     Ms. Kearney suffered actual damages as a result of the actions of Defendants. These actual damages include, without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage and copies, the payment for transportation to and from the courthouse and/or to and from her attorney's office. Actual damages also includes the loss of time in having to attend the court hearings or to have to go to meet with her attorney so sign

17

affidavits in opposition to CPS's motion for summary judgment, or otherwise prepare a defense to the collection action that should never have been filed in the first instance. Damages also include payment to CPS, through SP, induced under threat of judgment.

c. *Gwendolyn Bird*

72.     On August 9, 2010, CPS, through Thomas, filed a collection lawsuit against Gwendolyn Bird in the Civil Court of the City of New York, Richmond County.

73.     On August 14, 2010 Bird filed an answer and served discovery requests.

74.     On October 22, 2010, Choi substituted Thomas as counsel for CPS.

75.     On April 11, 2011 CPS, through Choi, filed a Notice of Motion for Summary Judgment.[15] The Motion for Summary Judgment contained attachments which demanded judgment and fees for CPS while at the same time demonstrating that CPS had no legal right to make the demands. The attachments to the motion included the following. The Affirmation In Support motion demanded judgment to be rendered in the name of CPS. The attached complaint demanded judgment in the name of CPS, as well as costs and disbursements.

76.     Most importantly, the Affidavit of Claim, Bill of Sale and Assignment that CPS attached to its Motion for Summary Judgment demonstrated that CPS had no standing to file or to continue its collection suit as to Ms. Bird for the same reasons CPS could not as to Ms. Rodriguez or Ms. Kearney. The Bill of Sale states that HSBC ("Seller") "does hereby sell, assign and convey to Purchaser [SPV I], its successors and assigns, ***all right, title and interest*** of Seller in and to" certain accounts. (emphasis added)

---

15 The Notice of Motion is (back) dated March 17, 2011. However, the court's stamp indicates it was not actually filed until April 11, 2011.

77.    In contrast, the Assignment between SPV I ("Assignor") and CPS ("Assignee") is more limited. SPV I does not assign "all right, title and interest" to CPS. Instead:

> [Assignor SPV I ]… transfers and assigns [to Assignee CPS]… all of Assignor's ***rights to pursue collection or enforcement of judicial enforcement of obligations*** for each of the Assignor's accounts… ***including engagement of attorneys and commencement of legal actions***, for the consideration of the "Service Fee" as defined in Amendment Number 1 to the Servicing and Management Agreement dated June 13, 2003, attached thereto as Exhibit A and incorporated herein.
>
> This assignment of Accounts shall be governed by the laws of the State of New York without regard to the conflict-of-laws rules thereof.
>
> (emphasis added)

78.    For the reasons explained for Samantha Rodriguez, this limited type of assignment is insufficient under New York assignment law to allow CPS to sue in its own name.

79.    The Assignment references a Service and Management Agreement ("SMA") dated June 13, 2003 between SPV I and CPS. The Assignment claims the SMA is attached, but in fact it was not. In the interest of a complete record, attached is the SMA to which the Assignment apparently refers, and that was filed in the public record in another matter. The SMA does nothing to increase the assignment right of CPS.

80.    On May 13, 2011, Bird filed an affirmation in opposition to the motion for summary judgment, stating that CPS submitted incomplete and invalid proof of assignment of the debt.

81.    On May 23, 2011, Richmond County Civil Judge Orlando Marrazzo, Jr. denied CPS's motion for summary judgment.

82.    On September 7, 2011, Schachter Portnoy LLC (Craig Faye, Esq.) was substituted for Choi as counsel for CPS.

83.    Ms. Bird's collection lawsuit is still pending. Attached and incorporated by reference are

the pertinent pleadings and discovery responses from the collection lawsuit.

84.     Ms. Bird suffered actual damages as a result of the actions of Defendants. These actual damages include, without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage and copies, the payment for transportation to and from the courthouse and/or to and from her attorney's office, the loss of time in having to attend the court hearings or to have to go to meet with her attorney to prepare a defense to the collection action.

### d.   *Laurie Goldstein*

85.     Plaintiff Laurie Goldstein has had the misfortune of being wrongfully sued by CPS not once, but twice. The two suits are set out below.

### *1) Cavalry Portfolio Services v. Laurie Goldstein, Index No. 3087-11*

86.     On January 21, 2011, CPS, through Choi, filed a collection lawsuit in Westchester County Supreme Court against Laurie Goldstein in Index No. 3087-11.

87.     CPS never served Ms. Goldstein with the summons and complaint. Instead, CPS filed a false affidavit of service with the clerk.

88.     Based on the false affidavit of service, CPS moved for entry of a default judgment. On March 14, 2011 CPS executed an Affidavit of Facts, falsely contending that CPS was entitled to judgment against Ms. Goldstein. CPS sought judgment in its own name, with costs and disbursements.

89.     On the application of CPS, the clerk issued a judgment in favor of CPS and against Ms.

Goldstein for $11,412,37, including $535.00 in costs.[16]

90.     On July 22, 2011, CPS, through Choi, issued an income execution, and served it directly on Ms. Goldstein's employer.

91.     On October 10, 2011 and October 27, 2011 CPS, through Schachter Portnoy, LLC, sent Ms. Goldstein collection letters stating that the account had been transferred to them from Choi. The letter instructed Ms. Goldstein to contact Schachter to arrange payment. The letters were signed for the firm by Craig Faye, Esq.  The October 10, 2011 letter stated the balance due on that date was $11,412.37, but the letter sent just 17 days later on October 27, 2011, increased the amount due by $812.86, to $12,556.38.

92.     On information and belief, Schachter Portnoy, LLC and Craig Faye, Esq. (collectively "Schachter") are substituting generally for collection lawsuits filed in the name of CPS.

93.     On November 17, 2011, Ms. Goldstein filed an order to show cause why the default judgment entered on June 6, 2011 should not be vacated for failure to serve, and to dismiss suit. Ms. Goldstein's affidavit demonstrated why the process server's affidavit was objectively false.

94.     The process server's affidavit alleged the process server served Ms. Goldstein personally, that the person served confirmed she was in fact Ms. Goldstein, and that the person further stated that she was not in the military. Specifically, the process server described Ms. Goldstein as follows: brown hair, age 27, height 5'4" – 5'6", weight 110 – 120. This description is objectively false.

95.     As Ms. Goldstein stated in her affidavit in support of her order to show cause:

---

16  Costs included $200.00 in "costs allowed by Statute"; $40.00 for service of the summons and complaint; $210.00 for the filing of the summons and complaint; $40.00 for the prospective Marshal's fees; and $45.00 for the clerk's fee to enter judgment.

> I do not look 27 and am actually 55.
> I have dirty blonde hair, not brown hair.
> My weight is 240 pounds, not 110 – 120.
> My height is 5'3", not 5'4" to 5'6"

96.     Ms. Goldstein's drivers license also shows her born in 1956 (not 1985), and her height to be 5'3" (not 5'4" to 5'6").

97.     Not to be deterred by facts, on December 14, 2011, CPS, through Schachter, filed an Affirmation in opposition to the order to show cause. The Affirmation used the false affidavit of service in an attempt to maintain the judgment obtained via sewer service despite the objective evidence that the process server could not have been describing Ms. Goldstein in his affidavit. The Affirmation also attached the Summons, which demanded judgment be entered in the name of CPS.

98.     On January 31, 2012 Westchester County District Court Judge Mary Smith granted Ms. Goldstein's order to show cause in part and set the matter down for a traverse hearing.

99.     After two hearings, the Court dismissed CPS' lawsuit.

100.    Attached and incorporated by reference are the pertinent pleadings, discovery responses, and collection letters in Index No. 3087-11.

101.    On information and belief, the assignment documents between SPV I and CPS for the debt sought to be collected via Index No. 3087-11 contains the same limitations on assignment as those for the other named plaintiffs: the right to collect is assigned, but title and ownership of the subject account is not assigned.

### 2)  *Cavalry Portfolio Services v. Laurie Goldstein, Index No. 11101-11*

102.    On May 13, 2011, CPS, through Choi, filed a second collection lawsuit in Westchester

County Supreme Court against Laurie Goldstein in Index No. <u>11101-11</u>. The complaint demanded judgment to be entered in the name of CPS, with costs and disbursements.

103.    Item # 2 in the verified complaint states, falsely, that CPS's primary business activity is the "purchase" of consumer receivables. This is false because, as we have seen, CPS does not purchase the accounts. CPS makes the representation that it has "purchased" the subject account to make it more difficult for consumers to challenge the collections lawsuit and thus making the consumer more likely to pay CPS.

104.    On June 28, 2011, Ms. Goldstein filed her answer.

105.    On August 3, 2011 CPS, through Choi, served answers to Ms. Goldstein's discovery requests. Those discovery responses, the relevant sections of which are attached, demonstrate that CPS has no standing to file or to prosecute the collection lawsuit.

106.    The key documents are the Affidavit of Claim, the Bill of Sale and Assignment of Loans, and the Assignment.

107.    The Affidavit of Claim is a August 8, 2011 affidavit of a CPS employee. The employee states that CPS "performs recovery services for its affiliate" SPV I. The employee states that account was "purchased" by SPV I on 4/23/3010 and "the servicing and collection rights for the account were assigned" to CPS.

108.    The Bill of Sale and Assignment of Loans dated April 23, 2010 states FIA Card Services, NC ("Assignor") "absolutely sells, transfers, assigns, sets-over, quickclaims and conveys to… [SPV I, "Assignee"]… *all of Assignors right, title and interest* in and to each of the loans identified in the loan schedule… together with the right to all principal, interest or other proceeds of any kind with

23

respect to the Loans remaining due and owing…" (emphasis added)

109.    In contrast, the Assignment between SPV I ("Assignor") and CPS ("Assignee") is more

limited. SPV I does not assign "all right, title and interest" to CPS. Instead:

> [Assignor SPV I ]… transfers and assigns [to Assignee CPS]… all of Assignor's ***rights to
> pursue collection or enforcement of judicial enforcement of obligations*** under each of
> the Assignor's accounts… ***including engagement of attorneys and commencement of
> legal actions***, for the consideration of Assignor's covenants in the Servicing and
> Management Agreement dated as of June 13, 2003.
>
> This assignment of Accounts shall be governed by the laws of the State of New York
> without regard to the conflict-of-laws rules thereof.
>
> (emphasis added)

110.    For the reasons explained for Samantha Rodriguez, this limited type of assignment is

insufficient under New York assignment law to allow CPS to sue in its own name. The Servicing

and Management Agreement of June 13, 2003 that the Assignment appears to be referencing is

attached by the undersigned (it was not attached in the collection lawsuit). The SMA does

nothing to increase the assignment right of CPS, however.

111.    The Affidavit of Claim as well as the "screen shot" CPS produced indicate that CPS is

seeking continued post-default, pre-judgment interest of 24.99%.

112.    The pertinent court documents and discovery responses from this 2nd collection lawsuit

against Ms. Goldstein are attached and incorporated by reference.

113.    Defendants' actions in both collections cases damaged Ms. Goldstein. She has incurred

expenses for copies, for postage, and for transportation (including gas, toll, parking, and/ or public

transportation). Ms. Goldstein has spent countless hours going to and from court, preparing

discovery requests or answers, preparing pleadings (including an order to show cause to vacate

24

judgment, a petition to proceed without paying court fees for filing a Request for Judicial Intervention, and filing an answer). This has taken valuable time and resources away from Ms. Goldstein as she seeks to obtain steady employment during these difficult economic times. Any amounts that CPS is successful in obtaining in its garnishment would also be actual damages. The ability to issue notices of garnishment is the fruit from the poisonous tree of a judgment rendered in the name of a debt collector with no standing to sue in the first place.

### E.   Class Action Allegations

114.   This Count is brought by Plaintiff, individually, and on behalf of a class consisting of all persons who, according to Defendants' records:

    **a.**   have mailing addresses within New York State; and

    **b.**   within one year before the filing of this action (for FDCPA claims) or within three years before the filing of this action (for GBL 349 claims and Judiciary Law 487);

        (1)   had a lawsuit pending against them by CPS; or

        (2)   were sent a written communication (including a pleading) or had a pleading filed in connection with a collection lawsuit against them in a New York Court that:

            (a)  was in a form materially identical or substantially similar to the exhibits attached to this complaint; or

            (b)  was made in connection with or related to a lawsuit filed by CPS; or

            (c)  threatened a lawsuit to be filed by CPS; or

            (d)  demanded judgment in the name of CPS; or

(e) demanded attorney's fees, costs or disbursements for CPS;

115.    Under Federal Rule of Civil Procedure 23, a class action is appropriate and preferable in this case because:

    **a.**   The fact that there are thousands of collection suits that are the heart of this FDCPA lawsuit, the classes are so numerous that joinder of all members is impractical.

    **b.**   There are questions of law and fact common to the class that predominate over any questions affecting only individual class members. These common questions include whether the exhibits attached to this complaint violate the FDCPA, GBL 349, or Judiciary Law 487.

    **c.**   The claims of Plaintiff are typical of the class members' claims. All are based on the same facts and legal theories. The only individual issue is the identification of the consumers who received the written communications or who had lawsuits filed against them, (i.e., the class members), which is a matter capable of ministerial determination from the Defendants' records.

    **d.**   Plaintiff will fairly and adequately represent the class members' interests. All claims are based on the same facts and legal theories and Plaintiff's interests are consistent with the interests of the class.

    **e.**   Plaintiff has retained counsel experienced in bringing class actions and collection abuse claims.

116.    Written communications, such as those sent by Defendants, are to be evaluated by the

objective standard of the hypothetical "least sophisticated consumer."

117.   A class action is superior for the fair and efficient adjudication of the class members' claims.

118.   Congress specifically envisions class actions as a principal means of enforcing the FDCPA. See 15 U.S.C. § 1692k.

119.   The class members are generally unsophisticated individuals unaware of the protections afforded them by the FDCPA, whose rights will not be vindicated in the absence of a class action.

120.   Prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications resulting in the establishment of inconsistent or varying standards for the parties and would not be in the interest of judicial economy.

121.   Defendant hereby seeks a pre-motion conference for class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure, but requests deadlines for filing the motions be stayed until the substantial completion of class discovery.

### COUNT # 1: Violations of the federal Fair Debt Collection Practices Act.

122.   Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

123.   The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). See also Hamilton v. United Healthcare of La., Inc., 310 F.3d 385, 392 (5th Cir.2002) ("Congress, through the FDCPA, has

legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope").

124.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." <u>See</u> S. Rep. No. 382, 95th Con., 1st Sess. 5, ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and <u>Jacobson v. Healthcare Fin. Servs.</u>, 516 F.3d 85, 91 (2d Cir. N.Y. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.")

125.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because she was alleged to owe a debt.

126.    The obligation alleged to be owed by named plaintiffs is a "debt" as defined by 15 U.S.C. § 1692a(5) because they were incurred primarily for family, personal or household purposes.

127.    Each of Defendants is a "debt collector" as defined in 15 U.S.C. § 1692a(6) their principal purpose is the collection of debts and/or they regularly attempt to collect debts, directly or indirectly.

128.    SPV I is a "debt collector" because it purchases hundreds of thousands of alleged consumer debts after they are in default with the putative original creditor. SPV I attempts to collect these debts indirectly through servicers and debt collection law firms who send hundreds

of thousands of collection letters, report monthly hundreds of thousands off accounts on the credit reports of consumer, make hundreds of thousands of collection telephone acts, and pursuing at least tens of thousands of collection lawsuits.

129.    CPS is a debt collector because it is attempts to collect alleged debts owned by others – including SPV I –by reporting hundreds of thousands of alleged accounts to the credit reporting agencies each month, by sending out hundreds of thousands of collection letters, by making hundreds of thousands of telephone calls. In this case, CPS has filed thousands of lawsuits in its own name in New York seeking to collect alleged defaulted debts. CPS is not the purchaser, owner or assignee of these debts, and does not does not own and retain all beneficial rights in interests therein.

130.    The Law Firms are each a debt collector because they file and litigate hundreds if not thousands of collection lawsuits, and sends tens of thousands of collection letters. The individual attorneys sign (or allege they sign) the pleadings, discovery instruments, and collection letters for the collection lawsuits filed by their firms. The individual attorneys made the debt collection attempts that give rise to this suit directly and indirectly through their firms.  On information and belief, the individual attorneys made the decisions to take the actions by their firms that form the basis of this complaint, who made the decision to file and to continue collection lawsuits for debts not owned by CPS, who developed the debt collection operations and policies of the law firms, and who exercised control over the operation and management of the collection activities of the law firms.

131.    John Does # 1 - 10 are persons, currently known to Plaintiff, who made the decisions to

take the actions that form the basis of this complaint, who made the decision to file and to continue collection lawsuits where CPS had no standing, who developed the debt collection operations and policies of CPS, SPV I, or the Law Firms, and exercised control over the operation and management of CPS, SPV I, or the Law Firms, or their subservicers.

132.    The actions of Defendants enumerated in the above statement of facts constitute an attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

133.    Defendants materially violated the following sections of the FDCPA: 15 USC 1692d, 1692e, and 1692f. By way of example and not limitation Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: engaging in conduct the natural consequence of which is to harass, oppress or abuse any person; using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; threatening to take and actually taking an action prohibited by law, or which is not intended to be taken; using false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

### F.    Count # 2: New York GBL § 349 *et seq.*

134.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein. The factual allegations state above constitute violations of GBL § 349, *et seq.*

135.    GBL § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state…"

136.    Defendants violated GBL § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses, trade, commerce or the furnishing of a service in New York. The violations include threatening, filing, prosecuting, seeking judgments and court costs in suits where CPS had no legal standing and seeking post-judgment collection remedies for thousands of collection lawsuits in the name of CPS.

137.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." GBL § 349(h).

138.    Defendants' conduct was consumer-oriented and has a broad impact on consumers at large and was Defendants' pattern, practice and policy. Defendants' conduct impacts the thousands of consumers in the state of New York. This broad impact includes threatening, filing, prosecuting, seeking judgments and court costs, and seeking post-judgment collection remedies for thousands of collection lawsuits in the name of CPS where CPS had no legal standing to file suit, demand judgment, or demand court costs.

139.    Defendants' acts and practices were misleading in a material respect and, objectively, were likely to mislead a reasonable consumer acting reasonably under the circumstances. Defendants both expressly and impliedly stated in verified complaints, in affidavits, and in motions that CPS was entitled to judgment and court costs when this was not true. The purpose of these

31

misrepresentations was to attempt to deceive even reasonable consumers into believing they had no basis to challenge the claim that CPS had a legal right to bring suit, and seek and obtain judgment and court costs; that any attempt to challenge CPS on these ground would be futile, and therefore that they should not challenge these suits in court but instead had no choice to pay what was demanded under the (illegal) threat of judgment and court costs.

140.    Defendants committed the above described acts willfully and/or knowingly.

141.    Defendants inflicted harm on New York consumers as a direct and proximate result of their violations of GBL § 349 *et seq*,

142.    As previously indicated**,** Rodriguez suffered actual damages and harm as a result of the actions of Defendants. This includes without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage for the mailing of pleadings and discovery, payment for copies, the payment for transportation to and from the courthouse, the loss of time in having to attend the court hearings. Actual damages include extreme mental and emotional distress, including anger, frustration, anxiety, feelings of powerlessness; a delay in being able to move herself and her young daughter out of the domestic violence shelter and into more permanent housing; and increased family stress with her daughter as a result of having to live in the shelter for a needlessly extended period of time. The judgment CPS obtained was the fruit from the poisonous tree of CPS filing suit in its own name when it had no standing to do so.

143.    Kearney's actual damages and harm include, without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage and copies, the payment for

32

transportation to and from the courthouse and/or to and from her attorney's office. Actual damages also includes the loss of time in having to attend the court hearings or to have to go to meet with her attorney so sign affidavits in opposition to CPS's motion for summary judgment, or otherwise prepare a defense to the collection action that should never have been filed in the first instance. Kearney also paid CPS and SP money as a result of their deceptive and abusive threats to enter judgment against her.

144.    Bird's actual damages and injury include, without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage and copies, the payment for transportation to and from the courthouse and/or to and from her attorney's office, the loss of time in having to attend the court hearings or to have to go to meet with her attorney to prepare a defense to the collection action.

145.    Goldstein's actual damages and harm include, without limitation, expenses for copies, for postage, and for transportation (including gas, toll, parking, and/ or public transportation). Goldstein has spent countless hours going to and from court, preparing discovery requests or answers, preparing pleadings (including an order to show cause to vacate judgment, a petition to proceed without paying court fees for filing a Request for Judicial Intervention, and filing an answer). This has taken valuable time and resources away from Goldstein as she seeks to obtain steady employment during these difficult economic times. Any amounts that CPS is successful in obtaining in its garnishment would also be actual damages. The ability to issue notices of garnishment is the fruit from the poisonous tree of a judgment rendered in the name of a debt collector with no standing to sue in the first place.

146.    Defendants' wrongful and deceptive acts have caused injury and damages to Named Plaintiffs and class members and unless enjoined will cause further irreparable injury.

147.    Plaintiffs are entitled to preliminary and permanent injunctive relief, and to recover actual and treble damages, civil penalties, costs and attorney's fees for Defendants violations of GBL § 349.

## G.    COUNT # 3, Judiciary Law § 487

148.    N.Y. Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or, "wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

149.    Defendants violated § 487 in their systematic misrepresentations to the courts and to consumers. Defendants both expressly and impliedly stated in verified complaints, in affidavits, and in motions that CPS was entitled to judgment and court costs when this was not true. The purpose of these misrepresentations was to attempt to deceive consumers into believing they had no basis to challenge the claim that CPS had a legal right to bring suit and to seek and obtain judgment and court costs; that any attempt to challenge CPS on these ground would be futile; and therefore that the consumers should not challenge these suits in court but instead had no choice to pay what was demanded under the (illegal) threat of judgment and court costs. Likewise, the purpose of these misrepresentations was to deceive the court that CPS was entitled to judgment in its own name, and costs of court, when it was not.

150.    Cavalry integrally participated in, consented to, and colluded with the acts that form the

34

basis of the Judiciary Law claim. CPS signed the verified complaints and affidavits in support of entry of default judgment, summary judgment, and oppositions to the orders to show cause stating that CPS was entitled to judgment and costs of court, when CPS was not so entitled.  CPS had control and a right to control the law firm defendants in filing and prosecuting these deceptive and meritless lawsuits.

151.    Each of the subsequent law firm Defendants consented to and colluded with the Judiciary Law violations of the prior law firms by continuing to pursue the lawsuits where CPS had no standing.

152.    Defendants violations of § 487 inflicted damages, for the reasons and in the manner previously indicated.

153.    Rodriguez suffered actual damages and harm as a result of the actions of Defendants. This includes without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage for the mailing of pleadings and discovery, payment for copies, the payment for transportation to and from the courthouse, the loss of time in having to attend the court hearings. Actual damages include extreme mental and emotional distress, including anger, frustration, anxiety, feelings of powerlessness; a delay in being able to move herself and her young daughter out of the domestic violence shelter and into more permanent housing; and increased family stress with her daughter as a result of having to live in the shelter for a needlessly extended period of time. The judgment CPS obtained was the fruit from the poisonous tree of CPS filing suit in its own name when it had no standing to do so.

154.   Kearney's actual damages and harm include, without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage and copies, the payment for transportation to and from the courthouse and/or to and from her attorney's office. Actual damages also includes the loss of time in having to attend the court hearings or to have to go to meet with her attorney so sign affidavits in opposition to CPS's motion for summary judgment, or otherwise prepare a defense to the collection action that should never have been filed in the first instance. Kearney also paid CPS and SP money as a result of their deceptive and abusive threats to enter judgment against her.

155.   Bird's actual damages and injury include, without limitation, expenses incurred in defending the collection lawsuit, including the payment of postage and copies, the payment for transportation to and from the courthouse and/or to and from her attorney's office, the loss of time in having to attend the court hearings or to have to go to meet with her attorney to prepare a defense to the collection action.

156.   Goldstein's actual damages and harm include, without limitation, expenses for copies, for postage, and for transportation (including gas, toll, parking, and/ or public transportation). Goldstein has spent countless hours going to and from court, preparing discovery requests or answers, preparing pleadings (including an order to show cause to vacate judgment, a petition to proceed without paying court fees for filing a Request for Judicial Intervention, and filing an answer). This has taken valuable time and resources away from Goldstein as she seeks to obtain steady employment during these difficult economic times. Any amounts that CPS is successful in obtaining in its garnishment would also be actual damages. The ability to issue notices of garnishment is the fruit from the poisonous tree of a judgment rendered in the name of a debt collector with no

36

standing to sue in the first place.

157.　Plaintiffs are entitled to actual damages, treble damages, and attorneys' fees and costs for Defendants' violations of N.Y. Judiciary Law § 487, and they so seek.

## H.　JURY DEMAND.

158.　Plaintiff demands a trial by jury.

## I.　PRAYER

159.　WHEREFORE, Plaintiffs and members of the class request the following relief joint and severally against Defendants:

a.　An order certifying this case as a class action under FRCP 23;

b.　A declaration that Defendants have committed the violations of law alleged in this action;

c.　An order enjoining and directing Defendants to cease violating GBL § 349 *et seq.*;

d.　Statutory damages under 15 U.S.C. § 1692k and GBL § 349(h);

e.　Civil penalties under GBL § 349 and Judiciary Law § 487;

f.　Treble damages under GBL § 349;

g.　Treble damages under GBL § 487;

h.　An order awarding disbursements, costs, and attorneys' fees under 15 U.S.C. § 1692k, GBL § 349, and Judiciary Law § 487.

i.　A judgment for actual, statutory, and treble damages;

**j.**  Prejudgment and post judgment interest as allowed by law;

**k.**  Injunctive relief;

**l.**  General relief; and

**m.**  All other relief, in law and in equity, both special and general, to which Plaintiffs and

the class may be justly entitled.

Dated:  Brooklyn, New York
        July 9, 2012

Respectfully submitted,

*/s/ Ahmad Keshavarz*

Ahmad Keshavarz,
One of Plaintiffs' Attorneys

**Attorneys for Plaintiffs**
Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Tel:    (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

Brian L. Bromberg
Bromberg Law Office, P.C.
40 Exchange Place, Suite 2010
New York, NY 10005
Tel: (212) 248-7906
Fax: (212) 248-7908
Email: brian@bromberglawoffice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this date electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Defendants Cavalry Portfolio Services LLC and Cavalry SPV I LLC
By and through their attorney of record
Donald S. Maurice
Rachel F. Marin, Esq.
Maurice & Needleman, P.C.
5 Walter E. Foran Blvd., Suite 2007
Flemington, New Jersey 08822
Direct (908) 905-5070
Main (908) 237-4550
Fax (908) 237-4551
Email: rmarin@mnlawpc.com

Defendants Choi Law Office PLLC and Danielle C. Choi
By and through their attorney of record
Lisa L. Shrewsberry
Hillary J. Raimondi
TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532
Telephone: (914) 347-2600
Facsimile: (914) 347-8898
e-mail: lshrewsberry@traublieberman.com

Defendants Schacter Portney, LLC and Craig Faye
By and through their attorney
Douglas Tischler
Rivkin Radler LLP
926 RXR Plaza
Uniondale, NY 11556-0926
Phone: (516) 357-3074
Fax: (516) 357-3333
Email: doug.tischler@rivkin.com

Date: Brooklyn, NY
July 9, 2012
        /s/
   Ahmad Keshavarz